# Exhibit A



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>GEORGE EDGAR WOLF | Case Number: 1916-CV03690 |
|---|---|
| Plaintiff/Petitioner:<br>ANASTASIA WULLSCHLEGER | Plaintiff's/Petitioner's Attorney/Address<br>JAMES PATRICK FRICKLETON<br>BARTIMUS FRICKLETON ROBERTSON<br>RADER, PC<br>11150 OVERBROOK RD, STE 200<br>LEAWOOD, KS 66211 |
| vs. | |
| Defendant/Respondent:<br>ROYAL CANIN U.S.A. | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: NESTLE PURINA PETCARE COMPANY

Alias:

C.T. CORPORATION SYSTEM
120 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105   *30CTCORe*

**COURT SEAL OF**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**JACKSON COUNTY**

13-FEB-2019
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

Must be sworn before a notary public if not served by an authorized officer:

Subscribed and sworn to before me on _____ (date)

*(Seal)*

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $ 10.00 | |
| Mileage | $_____ | ( ___ miles @ $. ___ per mile) |
| Total | $_____ | |

A copy of the summons and a copy of the petition must be served on each Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

ANASTASIA WULLSCHLEGER ET AL

           **PLAINTIFF(S),**              **CASE NO. 1916-CV03690**

**VS.**                                            **DIVISION 11**

ROYAL CANIN U.S.A ET AL

           **DEFENDANT(S).**

## NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE
## AND ORDER FOR MEDIATION

---

NOTICE IS HEREBY GIVEN that a Case Management Conference will be held with the Honorable **GEORGE EDGAR WOLF** on **29-MAY-2019** in **DIVISION 11** at **01:30 PM**. All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting. Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file. All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1. A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2. The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS. Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

    a.     A trial setting;

    b.     Expert Witness Disclosure Cutoff Date;

    c.     A schedule for the orderly preparation of the case for trial;

    d.     Any issues which require input or action by the Court;

    e.     The status of settlement negotiations.

Case 4:19-cv-00235-GAF   Document 1-1   Filed 03/26/19   Page 3 of 57

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.

/S/ GEORGE EDGAR WOLF
GEORGE EDGAR WOLF, **Circuit Judge**

Certificate of Service

This is to certify that a copy of the foregoing was mailed postage pre-paid or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition. It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
JAMES PATRICK FRICKLETON, BARTIMUS FRICKLETON ROBERTSON, RADER, PC, 11150 OVERBROOK RD, STE 200, LEAWOOD, KS 66211

Defendant(s):
ROYAL CANIN U.S.A.
NESTLE PURINA PETCARE COMPANY

Dated: 13-FEB-2019

MARY A. MARQUEZ
Court Administrator

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### AT KANSAS CITY

ANASTASIA WULLSCHLEGER,
704 W. Gregory
Kansas City, MO 64114

and

GERALDINE BREWER,
4615 Whisper Lake Dr., Apt. 5
Florissant, MO 63033

On behalf of
themselves and all others similarly situated,

           **Plaintiffs,**

vs.

ROYAL CANIN U.S.A., INC.,
Serve at:
STL Agent Services, Inc.
100 South Fourth Street, Suite 1000
St. Louis, MO 63102

and

NESTLE PURINA PETCARE COMPANY,
Serve at:
C.T. Corporation System
120 South Central Avenue
Clayton, MO 63105

           **Defendants.**

Case No._____
Div. _____

**JURY TRIAL DEMANDED**

## PETITION

COME NOW plaintiffs Anastasia Wullschleger and Geraldine Brewer, individually and on behalf of all other Missouri citizens similarly situated, and for their causes of action against Defendants, Royal Canin U.S.A., Inc. and Nestle Purina Petcare Company, demanding trial by jury of all issues so triable, state and allege as follows:

### I.   GENERAL OVERVIEW

1.     As further detailed hereinafter, Defendants Royal Canin U.S.A., Inc. ("Royal Canin") and Nestle Purina Petcare Company ("Purina"), in concert, combination, and conspiracy with other manufacturers of dog and cat food, including Mars Petcare US, Inc. ("Mars") and Hill's Pet Nutrition, Inc. ("Hill's") (collectively "the manufacturing conspirators"), have created and enforced upon retailers and consumers the mandatory use of a prescription, issued by a veterinarian, as a condition precedent to the purchase of certain dog and cat food ("Prescription Pet Food"). This self-created requirement for a veterinarian-issued prescription as a condition precedent to purchase Prescription Pet Food misleads reasonable consumers, including Plaintiffs, to believe that such food has been tested and approved by the United States Food & Drug Administration ("FDA"), has been subject to government inspection and oversight, and has medicinal and drug properties, for which consumers are willing to pay a premium. As further detailed herein, none of this is true.

2.     No federal, state, or local law requires a prescription for the sale of Prescription Pet Food. Prescription Pet Food has not been reviewed, tested, or approved by the FDA. Prescription Pet Food contains no drug or other ingredient that requires FDA approval or a prescription. Yet, Royal Canin, Purina, and their co-conspirators make disease treatment claims in their marketing and packaging for Prescription Pet Food, which require product review and

approval by the FDA under the United States Food, Drug, and Cosmetic Act ("FD&C Act"). Royal Canin, Purina, and their co-conspirators have not sought or obtained such FDA review and approval. The use by Royal Canin, Purina, and their co-conspirators of the prescription or Rx designation is thus false, misleading, and contrary to law.

3.      Defendants Royal Canin and Purina, together with Mars and Hill's, have further combined and conspired with pet food retailers and veterinary clinics, including PetSmart, Inc. ("PetSmart"); Medical Management International, Inc. d/b/a Banfield Pet Hospital ("Banfield"); BluePearl Vet, LLC ("Blue Pearl"); and VCA Inc. ("VCA") (collectively "the retail conspirators"), to communicate this false and misleading message to consumers in a wide-spread, sophisticated, and coordinated scheme, premised on the requirement for a prescription written by a veterinarian for purchase of Prescription Pet Food. This requirement for a prescription is communicated to consumers in a variety of ways, including messages on packaging, in-store displays, websites, and oral and written instructions to and from veterinarians. The false and misleading nature of the communications is exactly the same for each Prescription Pet Food for which a prescription is required by the manufacturing conspirators and for which a prescription is not actually required by law.

4.      Royal Canin, Purina, and the other manufacturing conspirators make other, non-prescription dog and cat food with similar ingredients and claims as those made for Prescription Pet Food, but sell their Prescription Pet Food at substantially higher prices as a result of the false prescription requirement. Reasonable consumers, including plaintiffs, would not pay the significantly higher prices charged for Prescription Pet Food if it were not for the false and misleading message that the coordinated prescription scheme communicates.

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

5.    For example, Royal Canin produces a Prescription Pet Food product called "Royal Canin Veterinary Diet Gastrointestinal Puppy dry" dog food that sells for $4.60 per pound, and another substantially similar non-prescription product called "Royal Canin Medium Puppy dry" dog food that sells for $2.09 per pound. The two products make essentially the same health claims and have an 89 percent overlap in ingredients. The non-overlapping ingredients are not drugs and are not sufficient to justify one product's being sold by prescription for a significantly higher price. Given the overlap in ingredients, and the absence of any drug or other ingredient required to be sold by prescription in the Prescription Pet Food product, the only meaningful distinction between the two products that is apparent to Plaintiffs and those similarly situated is the prescription requirement. The price differential is therefore based largely, if not entirely, on the prescription requirement imposed by Royal Canin, Purina, and the other companies in the combination.

6.    Prescription Pet Food contains no drug or other ingredient not also common in non-prescription pet food. Royal Canin, Purina, and their co-conspirators impose and enforce the prescription requirement to prey on the known propensities of consumers to love their pets and trust their vets.

7.    By participating in this deceptive scheme and combination, Royal Canin and Purina have violated the Missouri Antitrust Law, Mo. Rev. Stat., §§ 416.011 *et seq.*, the Missouri Merchandising Practices Act, Mo. Rev. Stat., §§ 407.010 *et seq.*, and Missouri law of unjust enrichment, all as more fully alleged hereafter.

8.    Retail consumers, including Plaintiffs, have overpaid and made purchases they otherwise would not have made in the absence of the abuse and manipulation of the prescription requirement by defendants and their co-conspirators. Plaintiffs bring this class action for

violation of the Missouri Antitrust Law, Mo. Rev. Stat., §§ 416.011 *et seq.*, the Missouri Merchandising Practices Act, Mo. Rev. Stat., §§ 407.010 *et seq.*, and Missouri law of unjust enrichment, on behalf of themselves and all those similarly situated Missouri citizens who directly or indirectly, for personal, family, or household purposes, have purchased Prescription Pet Food in Missouri manufactured and sold by Royal Canin, Purina, or any other member of the combination and conspiracy described herein, and seek redress from Royal Canin and Purina in the form of damages, trebled as required by law, restitution, injunctive relief, attorney fees, and all other relief this Court deems just and proper.

## II.    PARTIES

9.    Plaintiff Anastasia Wullschleger is a resident of Jackson County in the State of Missouri and the owner of a dog named Clinton. Her veterinarian at Banfield prescribed Royal Canin Prescription Pet Food for treatment of her dog. She purchased the Royal Canin Prescription Pet Food at PetSmart in Jackson County in the State of Missouri.

10.    ·Plaintiff Geraldine Brewer is a resident of St. Louis County in the State of Missouri and the owner of a cat named Sassie. Her veterinarians first at O'Fallon Veterinary Medical Center in O'Fallon, Missouri, and then at Florissant Animal Hospital in Florissant, Missouri, prescribed Purina Prescription Pet Food for treatment of her cat. She purchased the Purina Prescription Pet Food at these locations and also at PetSmart in Florissant.

11.    Defendant Royal Canin is a Delaware corporation with a principal place of business at 500 Fountain Lakes Blvd., Suite 100, Saint Charles, Missouri 63301. It is in the business of manufacturing, producing, marketing, advertising, distributing, and selling dog and cat food under various labels.

12. Defendant Purina is a Missouri corporation with a principal place of business in St. Louis, Missouri. Purina is in the business of manufacturing, producing, marketing, advertising, distributing, and selling dog and cat food under various brands or labels, including, but not limited to, Prescription Pet Food sold as "Purina Pro Plan Veterinary Diets." On the packaging of its Prescription Pet Food, Purina prominently displays the prescription sign "Rx." Purina is a member of the Nestle Group of companies under the ownership of Nestle S.A. In 2015, Purina was the second largest seller of Prescription Pet Food in the United States and the second largest seller of pet food in the world, with more than $11 billion in worldwide sales.

## III. NON-PARTY CO-CONSPIRATORS

13. The firms identified in this section of the Petition are non-party co-conspirators with Royal Canin and Purina in the conduct described in this Petition. Plaintiffs have not named these co-conspirators as defendants and seek no relief from them in this action. This is not intended to be an exhaustive list of co-conspirators.

14. Mars is a Delaware corporation with a principal place of business in Franklin, Tennessee. Mars is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels. Until January 1, 2017, at which time Mars ceased selling Iams Prescription Pet Food, Mars manufactured, produced, marketed, advertised, distributed, and sold Iams Prescription Pet Food. Royal Canin is a subsidiary or affiliate of Mars, and Mars' website indicates Royal Canin and Iams to be two of its five billion-dollar brands (another is Banfield Pet Hospital). Some combination of Royal Canin and Mars manufactures, produces, markets, advertises, distributes, and sells Prescription Pet Food sold as Royal Canin "Veterinary Diet." Hereinafter, "Mars/Royal Canin" describes Mars and Royal Canin collectively. In 2015, Mars was the largest seller of Prescription Pet Food

in the United States and the largest seller of pet food in the world, with more than $17 billion in worldwide sales.

15. PetSmart is a Delaware corporation with a principal place of business in Phoenix, Arizona. It is a national pet superstore chain founded in 1986 and the largest pet goods retailer in the United States and North America. PetSmart sells both non-prescription pet food and Prescription Pet Food. Approximately 900 of PetSmart's approximately 1,145 nationwide stores include an onsite "Banfield Pet Hospital," which is owned by Mars. There are at least 31 PetSmarts in Missouri, and 18 of these 31 PetSmarts include an onsite Banfield Pet Hospital. Through these locations, PetSmart sells Prescription Pet Food through a process by which Banfield Pet Hospital acts as the gatekeeper. As a precondition to purchasing Prescription Pet Food at PetSmart, all consumers must first obtain a "MedCard" showing the "Rx," "Rx Date," and "Rx #" from the onsite Banfield Pet Hospital, even if they present with a prescription from a third-party veterinarian. Thus Mars, through Banfield Pet Hospital, controls PetSmart's sale of Prescription Pet Food. PetSmart's websites will also not allow a customer to purchase Prescription Pet Food without a prescription from a veterinarian.

16. Since at least May 31, 2017, PetSmart has also owned the online pet-retailer Chewy.com. On July 26, 2017, PetSmart moved all of the content from its pet360.com website to Chewy.com, and redirected a number of its websites to Chewy.com. Since at least 2014, PetSmart-controlled websites have accounted for more than 40 percent of all pet-related website traffic. With PetSmart's acquisition of Chewy.com, that share has greatly increased. Through its websites, PetSmart sells Prescription Pet Food only to customers who present proof of a prescription from a veterinarian. In its brick and mortar stores, PetSmart displays Prescription Pet Food in a special section separate and distinct from the areas in which it sells non-

prescription pet food and prominently displays signs telling customers that "Prescription Diets Require a MedCard for Purchase." PetSmart, in its stores and websites, sells non-prescription foods manufactured by many manufacturers. The only Prescription Pet Food sold by PetSmart in retail locations is that made by Mars/Royal Canin, Purina, and Hill's. Online, prior to 2018, PetSmart sold only Mars/Royal Canin, Purina, and Hill's Prescription Pet Food. In 2018, however, as a result of litigation, PetSmart and Mars/Royal Canin, Purina, and Hill's permitted two smaller competitors for the first time to sell their Prescription Pet Food through Chewy.com.

17. Banfield is a Delaware corporation with a principal place of business at 8000 NE Tillamook, Portland, Oregon 97213. It is a member of the Mars corporate family of companies. It is the largest veterinary chain in the United States, operating veterinary clinics at approximately 900 PetSmart locations, and at dozens of stand-alone locations, and employing approximately 3,200 veterinarians. There are some 44 veterinarians employed by Banfield in Missouri, some 38 of which are in Banfield Pet Hospitals in Missouri PetSmarts. Banfield prescribes and sells Prescription Pet Food manufactured by Mars/Royal Canin, Purina, and Hill's, and no other Prescription Pet Food. Banfield has a contractual relationship with PetSmart to put veterinary hospitals in PetSmart stores throughout the United States. From 1994 through at least the first half of 2015, PetSmart owned approximately 21 percent of Banfield, or a holding company that owned Banfield, and Mars owned the remaining approximately 79 percent. Sometime after June of 2015, Mars, or its parent company, acquired 100 percent of Banfield. The relationship among PetSmart, Mars, and Banfield originated in 1994 when both PetSmart and Mars invested in Banfield, and PetSmart and Banfield entered into a strategic partnership agreement.

18.    Blue Pearl is a Florida corporation with a principal place of business at 3000 Busch Lake Boulevard, Tampa, Florida 33614. It is a member of the Mars corporate family of companies. It is the largest chain of animal specialty and emergency care clinics in the United States, with approximately 50 locations and 600 veterinarians. There are at least three (3) Blue Pearl locations in Missouri, employing some 21 veterinarians. Blue Pearl prescribes and sells Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's, and no other Prescription Pet Food. Mars, or its parent company, owns approximately 90 percent of Blue Pearl, which it acquired in 2015.

19.    VCA is a Delaware corporation with its principal place of business at 12401 West Olympic Boulevard, Los Angeles, California 90064. It is a member of the Mars corporate family of companies. VCA owns or controls approximately 800 veterinary locations employing more than 4,700 veterinarians. There are least four (4) VCA locations in Missouri, employing some 11 veterinarians. VCA was acquired by Mars on September 12, 2017. On information and belief, VCA sells or prescribes Prescription Pet Food manufactured by Mars/Royal Canin, Purina, and Hill's and no other Prescription Pet Food.

20.    Through its ownership of Banfield, Blue Pearl, and VCA, Mars employs 17 percent of the companion animal veterinarians in the United States through more than 1,700 locations employing approximately 8,500 veterinarians.

21.    Mars/Royal Canin, Purina, and Hill's collectively have a market share of at least 95 percent in the United States market for Prescription Pet Food. These entities likewise collectively have a market share of the Prescription Pet Food market in Missouri of a comparable percentage.

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

## IV. CONDUCT GIVING RISE TO VIOLATIONS OF LAW

### A. The Prescription Pet Food Market

22. Manufacturing, producing, marketing, advertising, distributing, and selling Prescription Pet Food is an approximately $2 billion per year industry in the United States. Worldwide, the top 40 pet food companies had total revenue of $46 billion in 2015. Of that, Mars/Royal Canin, Purina, and Hill's had combined revenues of $30 billion, for a 65 percent worldwide market share. The market for pet food in the United States was half of that, $23 billion, and Mars/Royal Canin, Purina, and Hill's had a combined market share in excess of 50%.

23. Hill's began limited sales in the 1960s of its "Prescription Diet" through veterinarians and in the late 1980s first began supplying veterinarians with prescription pads as part of its marketing effort. The Prescription Pet Food market in the United States, and in Missouri, is the creation of Mars/Royal Canin, Purina, and Hill's and the retail conspirators named above, and did not exist to any significant extent until 2005, when Hill's, Mars/Royal Canin, PetSmart, and Banfield formed the combination and conspiracy described hereafter, which Purina subsequently joined, as did Blue Pearl and VCA upon their acquisition by Mars, if not before.

24. Since 2005, Prescription Pet Food has been a distinct market, or a distinct sub-market of the dog and cat food market in the United States, and in Missouri. The market for Prescription Pet Food is characterized by specialized vendors and sales channels, distinct and different pricing, and different customers from the general pet food market. Specifically, Prescription Pet Food is sold only through prescribing veterinarians and retailers honoring and filling such veterinary prescriptions; prices are substantially higher for Prescription Pet Food

than for non-prescription pet food by reason of the prescription requirement; and Prescription Pet Food is marketed and sold only to pet owners who have obtained a veterinarian's prescription for Prescription Pet Food.

25.     Mars/Royal Canin manufactures and markets its Prescription Pet Food in packaging labeled "Veterinary Diet." Purina manufactures and markets its Prescription Pet Food in packaging labeled "Pro Plan Veterinary Diets," in which the Rx prescription symbol appears by extending the bottom of the second "r" in "veterinary" to intersect with tail of the "y." Hill's manufactures and markets its Prescription Pet Food in packaging labeled "Prescription Diet." At PetSmart's website, the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's is displayed with an Rx symbol beside it as follows:

 RX INFO REQUIRED

26.     On the Chewy.com website, which PetSmart has owned since May 31, 2017, the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's is also displayed with an Rx symbol beside the words, "This prescription item requires vet approval." As explained in the website's "Questions & Answers" section, "[a]t checkout you'll be prompted for vet information. Once your order is placed, our Prescription Team will reach out to your vet by phone or fax. To expedite the process, you may email a photo of the prescription to us at rx@chewy.com or fax it . . . [and] we don't need to reach out to the veterinarian if you have the written prescription."

27.     PetSmart sells Prescription Pet Food only in its brick and mortar stores housing a Banfield veterinary clinic, and displays Prescription Pet Food in a section separate and distinct from where it displays non-prescription pet food, in a special aisle immediately adjacent to the Banfield clinic, and with prominent signs stating "Prescription Diets Require a MedCard for Purchase. See a Banfield associate for details." In order to purchase Prescription Pet Food at a

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

brick and mortar PetSmart, a consumer must first obtain a MedCard from Banfield. The card includes entries for the "Rx" food, the "Rx Date," and the "Rx #."

28.     There are significant barriers to entry in the Prescription Pet Food market, which require substantial research and development expertise and investment, the ability to reach veterinary clinics through a separate sales force and distribution network, and, for those competing ethically with a prescription Rx designation, submission to and compliance with FDA regulatory requirements and processes. Divisions of larger companies, Mars/Royal Canin, Purina, and Hill's dominate the Prescription Pet Food market by reason of substantial investments in their Prescription Pet Food products and their close relationships with veterinarians, veterinary clinics, and veterinary schools. In addition, these companies have a significantly larger number of veterinary sales representatives and greater financial resources than actual and potential new entrants.

29.     The Prescription Pet Food market requires successful distribution arrangements with national pet superstore chains, such as PetSmart, Chewy, and Petco, which collectively sell roughly 60 percent or more of branded (non-private label) pet food and a higher share of Prescription Pet Food, as well as alliances with major veterinary chains, such as Banfield, Blue Pearl, and VCA. Petco sells Prescription Pet Food only on its website, and first began selling Prescription Pet Food around November 2016. Such alliances with pet superstore and veterinary chains are necessary because the pet food retail and veterinary markets are otherwise highly fragmented and dispersed, consisting of thousands of small stores and clinics, rendering distribution costs for Prescription Pet Food prohibitively expensive in the absence of alliances with pet superstore retailers and major veterinary chains.

30.     As noted, continuously from 2005 through the present, Mars/Royal Canin, Purina, and Hill's collectively have had a combined share of the Prescription Pet Food market in excess of 95 percent, at times approaching or equaling 100 percent. For the five years next preceding the filing of this lawsuit, Mars/Royal Canin, Purina and Hill's collectively had a combined market share of the Missouri Prescription Pet Food market of at least 95 percent.

31.     Today, there are only three other companies, small relatively recent entrants, attempting to compete with Mars/Royal Canin, Purina, and Hill's in the Prescription Pet Food market in the United States, and in Missouri:

(a) Blue Buffalo Company, based in Wilton, Connecticut, which markets a line of Natural Veterinary Diet—Rx dog and cat food, in addition to lines of non-prescription BLUE dog and cat food;

(b) Diamond Pet Foods, based in Meta, Missouri, which markets Diamond Rx Renal Formula pet food, in addition to lines of non-prescription dog and cat food; and

(c) Darwin's Natural Pet Products, based in Tukwila, Washington, which markets Intelligent Design Prescription Meals, in addition to lines of non-prescription dog and cat food.

Blue Buffalo and Diamond sell their Prescription Pet Food through veterinarians only, and cannot obtain distribution through PetSmart brick and mortar stores and, until 2018, its web sites, although PetSmart and its web sites stock and sell their non-prescription pet food. As noted, only after being sued, PetSmart and Mars/Royal Canin, Purina, and Hill's for the first time, in 2018, permitted Blue Buffalo and Diamond to sell their Prescription Pet Food through Chewy.com. Darwin's sells its Prescription Pet Food pet food directly from Missouri once a customer obtains a prescription from a veterinarian. Before 2018, unlike Mars/Royal Canin, Purina, and Hill's,

none of the three smaller competitors were able to sell Prescription Pet Food through PetSmart, its websites, or Banfield. Plaintiffs are informed and believe that agreements between and among Mars/Royal Canin, Purina, Hill's, PetSmart, and Banfield prohibit and restrict PetSmart and Banfield from stocking and selling Prescription Pet Food made by these small and other competitors.

32.     The past, present, and future ownership, operation, and control of veterinary clinics and hospitals by PetSmart and Mars have created significant barriers to entry in the Prescription Pet Food market in the United States, and in Missouri, for actual and potential competitors by effectively foreclosing distribution outlets necessary for sellers of competing Prescription Pet Food, who cannot effectively reach customers without distribution through PetSmart and the veterinary chains owned by Mars because of the prohibitive expense in selling only to the thousands of individual and small group veterinary practices.

33.     As majority shareholder and now sole owner of Banfield, Mars/Royal Canin has possessed and exercised the power to determine the manufacturers whose Prescription Pet Food is prescribed and sold through Banfield and PetSmart, as well as through Blue Pearl and VCA. Mars/Royal Canin has exercised that power to allow only prescribing and sale of Prescription Pet Food manufactured by Purina, Hill's, and itself.

## B.     The False, Deceptive, and Misleading Prescription Requirement

34.     Neither federal nor Missouri law requires that Prescription Pet Food be sold with a prescription from a veterinarian. None of the Prescription Pet Food purchased by the Plaintiffs contains a drug, and none has been submitted to the FDA for its review, analysis, or approval. The same is true for all Prescription Pet Food.

35.     By requiring a prescription from a veterinarian as a pre-condition to the purchase of their Prescription Pet Food, Mars/Royal Canin, Purina, and their co-conspirators misrepresent Prescription Pet Food to be: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and (e) a substance legally required to be sold by prescription. Prescription Pet Food is none of these.

36.     Most pet owners experience the heartfelt concern that accompanies trips to the veterinarian, as well as the willingness to follow doctor's orders to their fullest extent. Plaintiffs are reasonable consumers who expect that pet food that requires a prescription from a veterinarian as a condition of purchase has been submitted to and approved by the FDA for the particular purposes and conditions for which it has been prescribed and that the product carries with it all of the testing, analysis, safety assurances, and efficacy that any product submitted to and approved by the FDA would have. Accordingly, reasonable consumers, including Plaintiffs, are willing to pay a premium for Prescription Pet Food.

37.     To obtain Prescription Pet Food, customers must either (a) buy it directly from the veterinarian who prescribes it, or (b) take the prescription to a business that sells Prescription Pet Food, such as Banfield, Blue Pearl, VCA, a PetSmart store with Banfield on-site, or a PetSmart web site. In this way, Mars/Royal Canin, Purina, and their co-conspirators control the sale of Prescription Pet Food at retail to those with a prescription from a veterinarian so as to create for the consumer the experience of buying a drug and give the reasonable but false and misleading impression of a government tested and approved product warranting a premium price.

38.     Plaintiffs, as reasonable retail consumers, (a) understand the requirement for a prescription to mean that a governmental authority has sanctioned and controls the use and distribution of the product and has provided its required oversight and review; (b) associate prescription fulfillment with following doctor's orders; and (c) experience the prescribing and purchase of Prescription Pet Food in the exact same manner as an actual prescription drug for a dog or cat.

39.     Plaintiffs, as reasonable consumers, humanize their pets. In marketing and selling Prescription Pet Food, Mars/Royal Canin, Purina, and their co-conspirators take advantage of and betray vulnerable pet owners concerned about the health of the family pet, and prey on the known propensities of Plaintiffs and others similarly situated to treat their pets as family.

40.     Prescription Pet Food:

(a) has not been subjected to the FDA process for evaluating the quality of drug ingredients and manufacturing processes;

(b) has not been subjected to the FDA process for evaluating the efficacy of claims and propriety of representations;

(c) does not contain any ingredient listed as a drug in the FDA's "Green Book," a publication listing all approved animal drugs;

(d) does not appear as a drug in the Green Book;

(e) does not contain any drug approved by the FDA; and

(f) does not bear the mandatory legend borne by those items required by the FDA to be sold by prescription (i.e., "Caution: Federal law restricts this drug to use by or on the order of a veterinarian.").

41. Mars/Royal Canin, Purina, and their co-conspirators have at all times known that Prescription Pet Food is not legally required or allowed to be sold by prescription, that representing expressly or implicitly that a prescription is legally required is false, and that all of them know this.

42. Mars/Royal Canin, Purina, and their co-conspirators have at all times also known that there is no medicine, drug, or other ingredient in Prescription Pet Food required by law to be submitted to or approved by the FDA or another governmental entity, that neither the FDA nor any other governmental entity has undertaken any review or approval process, and that neither the FDA nor any other governmental entity has approved Prescription Pet Food for treatment of any condition or illness.

43. Mars/Royal Canin, Purina, and their co-conspirators impose the condition precedent of a prescription from a veterinarian, and such condition precedent is an integral step in the marketing, sale, and purchase of Prescription Pet Food.

44. The intended purpose and effect of the prescription requirement has been to enable Mars/Royal Canin, Purina, and their co-conspirators to market and sell Prescription Pet Food at excessive, inflated prices above the price of non-prescription pet food making substantially similar treatment claims. The supra-competitive price premium for Prescription Pet Food is not cost-justified and is the intended result of the false, deceptive, and misleading prescription requirement imposed by Mars/Royal Canin, Purina, and their co-conspirators.

## C. The Combination and Conspiracy

### 1. Formation

45.    In 1994, PetSmart, Mars, and Banfield entered into a combination to transfer ownership and control of Banfield to PetSmart and Mars and execute a contract for a strategic partnership among themselves locating Banfield pet hospitals in PetSmart stores.

46.    At that time, Prescription Pet Food was not a significant factor or a recognized sub-market in the United States pet food market. Hill's was the primary seller of pet food through veterinarians and was using the term "Prescription Diet."

47.    By 2004, however, this had changed, with Hill's becoming a significant player in the sale of pet food for which an actual prescription was required, although no prescription was legally required. Mars/Royal Canin, as the market leader confronted with a growing threat from Hill's, faced the choice of competing with Hill's non-prescription pet food, or colluding with Hill's in the fraudulent sale of Prescription Pet Food at unjustified enhanced prices. It chose the latter course, developing and introducing its own Veterinary Diet line of Prescription Pet Food.

48.    In March of 2005, Mars/Royal Canin, Hill's, PetSmart, and Banfield entered into a combination and conspiracy to sell Prescription Pet Food, pursuant to which they agreed:

(a) to restrict the retail sale of their Prescription Pet Food to pet owners who had obtained and presented a prescription;

(b) to require that retail sellers enforce their prescription and presentation requirement; and

(c) to restrict retail sellers to those who agreed to enforce the prescription requirement, all with the purpose and effect of raising, fixing, stabilizing, and pegging prices of Prescription Pet Food.

49.    In furtherance of the combination and conspiracy, Hill's entered into a "merchandising agreement" with PetSmart and Banfield, which Mars and PetSmart owned, to sell Hill's Prescription Pet Food in all PetSmart stores with an on-site Banfield pet hospital.

50.    At that time, PetSmart and Banfield were selling Mars/Royal Canin Prescription Pet Food, and Mars had the power to exclude Prescription Pet Food competitors from Banfield and PetSmart by reason of its majority ownership of Banfield. Nonetheless, contrary to its independent economic interest, Mars/Royal Canin agreed to allow its Prescription Pet Food competitor, Hill's, into Banfield and PetSmart in furtherance of their combination and conspiracy. PetSmart and Banfield have sold Hill's and Mars/Royal Canin Prescription Pet Food continuously since 2005 through the present day.

51.    Once Hill's, Mars/Royal Canin, PetSmart, and Banfield formed their combination and conspiracy in 2005, Purina faced the same choice Mars/Royal Canin had faced: compete or collude. Like Mars/Royal Canin, it chose to collude and joined the combination and conspiracy.

52.    Similarly, Mars/Royal Canin faced the same choice: whether to exercise its power to exclude its Prescription Pet Food competitor, Purina, from Banfield and PetSmart. Again, contrary to its independent economic interest, Mars/Royal Canin allowed Purina to begin selling Prescription Pet Food through Banfield and PetSmart in approximately 2006 and to join the existing combination and conspiracy in the misleading and deceptive sale of Prescription Pet Food with the purpose and effect of raising, fixing, stabilizing, and pegging Prescription Pet Food prices. PetSmart and Banfield have sold Purina Prescription Pet Food continuously since 2005 through the present day.

53.    Although Mars/Royal Canin, Purina, and Hill's have continuously sold Prescription Pet Food through Banfield and PetSmart in furtherance of their combination and

conspiracy, Mars/Royal Canin, Purina, and their co-conspirators have prevented their smaller Prescription Pet Food competitors from doing so. In furtherance of their combination and conspiracy, Mars/Royal Canin, Purina, and their co-conspirators agreed that Banfield and PetSmart would not stock, offer, or sell Blue Buffalo Natural Veterinary Diet dog and cat food, Darwin's Intelligent Design Prescription Meals, or Diamond Care Rx Renal Formula, the prescription dog and cat foods of their other competitors. Prescription Pet Food of these smaller competitors was also not available on the PetSmart-controlled websites until 2018, when Blue Buffalo and Diamond were allowed to sell their Prescription Pet Food on Chewy.com. PetSmart, PetSmart.com, and Chewy.com, have, however, carried the non-prescription dog and cat food of Blue Buffalo Company and Diamond.

54.    As a result of their combination, Mars/Royal Canin, Purina, and their co-conspirators created a separate and distinct market for Prescription Pet Food, which had not previously existed, which enabled them to sell Prescription Pet Food at anticompetitive, enhanced prices, and which they have dominated.

### 2.    Perpetuation

55.    In September of 2012, the FDA published for comments a Draft Compliance Policy Guide ("Draft CPG"), "LABELING AND MARKETING OF NUTRITIONAL PRODUCTS INTENDED FOR USE TO DIAGNOSE, CURE, MITIGATE, TREAT, OR PREVENT DISEASES IN DOGS AND CATS."

56.    The Draft CPG expressly stated at the outset, "This draft Compliance Policy Guide, when finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public."

57. The Draft CPG was intended for guidance of FDA staff in deciding whether to institute enforcement actions against violations of the FD&C Act and related statutes by manufacturers of dog and cat food products "identified on their labels or in labeling as being intended for use to diagnose, cure, mitigate, treat, or prevent diseases." Such products included the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's. For example:

(a) Mars' Royal Canin Prescription Pet Food labels stated that they were for issues including "Renal Health," "Gastrointestinal and Dermatological Health," "Struvite Dissolution," "Digestive Health," "Protect[ing] Healthy Skin & Coat," "minimiz[ing] glucose fluctuations," "Cardiac Health," "Calorie Control," and others. Further, each Royal Canin Prescription Pet Food stated on its package that Royal Canin had the knowledge to "formulate the optimal diet for your [pet's] special needs."

(b) Mars' Iams Prescription Pet Food labels stated that they were for issues including "Glucose and Weight Control," "Management of Skin & Coat and Gastrointestinal Health," "Nutritional Management of Joint and Senior Health," "Nutritional Management of Kidney Health," "Help[ing] your pet safely reach and maintain her ideal weight," and others. Further, each Iams Prescription Pet Food stated on its package that it was "prescribed and sold by veterinarians" and "[a]uthorized by prescription and sold only through veterinarians."

(c) Purina Prescription Pet Food labels stated that they were for issues including "promot[ing] a urinary environment unfavorable to the development of both struvite and calcium oxiate cystals," "significantly reduc[ing] build-up of tartar," "support[ing] intestinal health," "maintain[ing] lean body mass," and others. Further, each Purina Prescription Pet Food package was branded with an "Rx" symbol and the Rod of

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

Asclepius (the snake wrapped around the rod, a universal symbol of medicine) and stated that "our goal is to help your pet lead an active, healthy lifestyle."

(d)     Hill's Prescription Pet Food labels stated that they were for issues including "weight management," "digestive care," "food sensitivities," "urinary care," "kidney care," "dental care," "aging care," "glucose management," "heart care," "joint care," "liver care," "skin sensitivity," "thyroid care," "urgent care," and others. Further, each Hill's Prescription Pet Food package stated it was a "Prescription Diet," represented that the contents were "Clinical Nutrition," bore an image of a stethoscope, and explained "How this product will help your pet."

58.     The Draft CPG concluded that such products met the definition of drugs and food under the FD&C Act. Therefore, if such products, including the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's, did not have an approved New Animal Drug Application or meet other FD&C Act requirements, they were "unsafe," "adulterated," "misbranded," illegal, and subject to enforcement actions by the FDA.

59.     All of the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's lacked an approved New Animal Drug Application or met other FD&C Act requirements, and therefore all of their Prescription Pet Food was "unsafe," "adulterated," and "misbranded" in violation of the FD&C Act.

60.     The term "prescription" did not appear in the Draft CPG, which did not recommend, suggest, or approve of the use of a prescription requirement in the marketing or sale of offending products, including Prescription Pet Food. Nor did the term "authorize" appear in the draft CPG.

61.    At the time of the Draft CPG, both the pet food industry and the veterinary profession widely held the view that use of a prescription requirement was improper and misleading for products not subjected to FDA review and approval. In a filed comment on the Draft CPG, the American Feed Industry Association, representing "more than 550 domestic and international companies and state, regional and national associations," recommended "that pet food products subject to this CPG should be regulated in a manner similar to human medical foods, as veterinary medical foods." According to the FDA, "The labeling of medical foods may not bear the symbol 'Rx only'," because "medical foods are not required by federal law to be dispensed by prescription," and "[t]herefore, the use of the symbol 'Rx only' in the labeling of a medical food would misbrand a medical food under section 403(a)(1) of the FD&C Act because it would be a false and misleading statement about that product." Another filed comment from the American Veterinary Medical Association ("AVMA"), known as "the recognized national voice for the veterinary profession," representing 83 percent of all U.S. veterinarians, recommended that because Prescription Pet Food had "not been evaluated by FDA for safety, efficacy, or nutritional adequacy, ... all pet food products with implied or explicit health or drug claims [should] include a prominent statement on the label that these claims have not been evaluated by the FDA."

62.    Despite these FD&C Act violations by Mars/Royal Canin, Purina, and Hill's, the Draft CPG stated that FDA staff had discretion to withhold enforcement against offending products provided such products met each of nine requirements. Conditions 1 and 5-7 were: (1) "The product is made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian."; (5) "The product does not include indications for a disease claim (e.g., obesity, renal failure) on the

label."; (6) "Distribution of labeling and promotional materials with any disease claims for the product is limited so that it is provided only to veterinary professionals."; and (7) "Electronic resources for the dissemination of labeling information and promotional materials are secured so that they are available only to veterinary professionals."

63.     Mars/Royal Canin, Purina, and Hill's were clearly not in compliance with conditions 5, 6, and 7 of the Draft CPG, in that their Prescription Pet Food included indications for disease claims (*e.g.*, obesity, kidney problems) on the labels (condition 5); their labeling and distribution of promotional materials with disease claims were not limited to veterinary professionals (condition 6), but went to consumers generally; and their electronic dissemination of labeling and promotional materials with disease claims was not secured so as to be available only to veterinary professionals (condition 7), but was directed to consumers on the internet.

64.     Specifically:

(a)     For its Royal Canin and Iams Prescription Pet Food, Mars made advertising and marketing representations directly to consumers that its Prescription Pet Food is a prescription product intended to address disease. In addition to its labeling claims, Mars' Royal Canin web site stated, "Our Veterinary-Exclusive diets support a wide range of health issues such as: Urinary Health, Skin and Food Allergies, Diabetes, Digestive Support, Liver Health, Joint Support, Illness and Surgery Recovery Support, Renal Health, Weight Management, and Cardiac Health."

(b)     For its "Pro Plan Veterinary Diets," Purina made advertising and marketing representations directly to consumers that its Prescription Pet Food was a prescription product intended to address disease. In addition to labeling claims, the Purina website extolled the benefits of Purina's Prescription Pet Foods and told consumers to "[a]sk your

veterinarian if Purina Pro Plan Veterinarian Diets cat foods and dog foods can help manage your pet's health." The web site stated, "Purina Pro Plan Veterinary Diets dog and cat foods deliver nutrition with a purpose. Available only from your veterinarian, they play an important role in nutritionally managing dogs and cats with certain conditions. Each formula has been developed with specific nutrients to support pets with health issues."

(c)     In its "Prescription Diet" line, Hill's made advertising and marketing representations directly to consumers that its Prescription Pet Food is a prescription product intended to address disease. In addition to its labeling claims, above, Hill's website explained the benefits of its Prescription Pet Food, and let consumers search products by pet "conditions" (such as "weight management," "digestive care," "food sensitivities," "urinary care," "kidney care," "dental care," "aging care," "glucose management," "heart care," "joint care," "liver care," etc.). The web site also stated: "Select dog or cat and discover the benefits of Hill's® Prescription Diet® therapeutic pet foods — formulated for most of your pet's life care needs...No matter what health issues your dog is facing, our alliance with veterinarians puts us in a unique position to find a solution. Ask your vet how the Prescription Diet® dog foods can help his weight, mobility, kidney, digestive, urinary and skin and coat health."

65.     In view of the Draft CPG and their non-compliance with the FD&C Act, Mars/Royal Canin, Purina, and Hill's were confronted with the choice of whether to continue marketing their Prescription Pet Food in violation of federal and state law, or to eliminate the prescription requirement and otherwise comply with law. They decided jointly at that time, in the

Fall of 2012, to continue their combination and conspiracy marketing Prescription Pet Food exactly as they had been doing, and they have continued to do so through the present.

66.     In response to the Draft CPG and the FDA's request for comments, Mars/Royal Canin, Purina, and Hill's met under and exploited the cover of their trade association, the Pet Food Institute ("PFI"), to deal with the threat posed by the Draft CPG to their Prescription Pet Food business. At the time of the Draft CPG, Mars/Royal Canin, Purina, and Hill's were all represented on the PFI Board of Directors by their top executives. Hill's was represented on the PFI Board of Directors by its President, U.S., Kostas Kontopanos. On the Board of Directors and the PFI Executive Committee were Purina's President, Americas, Joe Sivewright, and Mars' General Manager, Chris Hamilton. Mr. Sivewright was also Vice-Chairman of PFI's Board. Royal Canin was represented by Randy King, Global Head of Safety and Regulatory of P&G Pet Care. In addition, representatives of Purina and Mars chaired the PFI's two standing committees, Public Affairs (Purina) and Regulatory Affairs (Mars), which was involved in responding to the FDA's request for comments.

67.     Under the auspices of the PFI, from September to early November, 2012, Mars/Royal Canin, Purina, and Hill's met and discussed how their existing combination and conspiracy to market and sell Prescription Pet Food could be preserved and continue without change or interruption.

68.     On November 8, 2012, at the instance of Mars/Royal Canin, Purina, and Hill's, the PFI wrote the FDA in defense of their Prescription Pet Food marketing practices. The letter stated that although pet food making therapeutic claims "are not drugs" and "no drug registration or drug listing should be required," such products should nevertheless "only be available to the

public through licensed veterinarians with whom the purchaser has a valid Veterinary-Client-Patient Relationship."

69.     As of that time, Mars/Royal Canin, Purina, and Hill's jointly agreed that they would continue their combination and conspiracy to engage in deceptive marketing and sale of Prescription Pet Food with the purpose and effect of charging supra-competitive prices, notwithstanding their violations of the FD&C Act. They further agreed that all would construe the Draft CPG to require them to use a prescription requirement, and to contend that their use of the prescription requirement was a good faith effort to comply with the Draft CPG, notwithstanding their clear violations of its conditions. They decided jointly at that time to continue their combination marketing Prescription Pet Food exactly as they had been doing and have continued to do so through the present.

70.     In April, 2016, the FDA published the CPG as Sec. 690.150 Labeling and Marketing of Dog and Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases (the "Published CPG"). The Published CPG was substantially identical to the Draft CPG with only minor changes, the most significant of which was expansion of the required conditions for exercise of enforcement discretion from 9 to 11. In the Published CPG, what had been conditions 5-7 became conditions 3-5, respectively. The Published CPG contained the same disclaimer that "It does not establish any rights for any person and is not binding on FDA or the public." Similarly, it found that therapeutic pet food making disease claims, as did the Prescription Pet Food of Mars/Royal Canin, Purina, and Hill's, was unsafe, adulterated, and misbranded in the absence of compliance with the FD&C Act. Like the Draft CPG, the Published CPG did not use the word "prescription," the word "authorization," or any derivative of "prescription" or "authorization."

71. Despite the publication of the CPG, Mars/Royal Canin, Purina, and their co-conspirators have complied with neither the FD&C Act nor the conditions for the exercise of enforcement discretion set forth in the CPG. They have at all times in the five years next prior to the filing of this Petition continued to manufacture, market, and sell Prescription Pet Food as part and in furtherance of their contract, combination, and conspiracy to deceive consumers with the purpose and effect of raising, fixing, stabilizing, and pegging prices.

72. Additionally, in the five years next preceding the filing of this Petition, Mars/Royal Canin, Purina and Hills' have failed to comply with certain manufacturing requirements as follows:

a) The FDA wrote in the CPG that "under the FD&C Act, dog and cat food products that are intended to treat or prevent disease and to provide nutrients in support of the animal's daily nutrient needs can be regulated as drugs (section 201(g) of the FD&C Act [21 U.S.C. 321(g)]), foods (section 201(f) of the FD&C Act [21 U.S.C. 321(f)]), or both."

b) Mars/Royal Canin, Purina, and each other non-party co-conspirator represent on the labels and packaging of the Prescription Pet Food that their products are intended to treat, prevent, and/or mitigate diseases. See, e.g., ¶¶ 57, 64. Further, Mars/Royal Canin and Purina all manufacture, ship, mail, and/or deliver their Prescription Pet Food products to, from, or within the State of Missouri. See, e.g., ¶¶ 11, 12.

c) Missouri defines a "Legend drug" as "[a]ny drug or biological product . . . that is restricted to use or dispensed by practitioner only." Mo. Rev. Stat. § 338.330(2)(a)(c).

d) Prescription Pet Food is dispensed by practitioners only, through and because of the Defendant manufacturer co-conspirators' prescription requirement, and thus such

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

Prescription Pet Food is a "drug" and a "legend drug" under Missouri law. See Mo. Rev. Stat. §338.330.

e) All manufacturers of "drugs" must register and list those drugs with the FDA, regardless of whether those drugs are approved or index listed. 21 U.S.C. § 360. Failure to register as a manufacturer and list such drugs makes the drugs misbranded under the FD&C Act. 21 U.S.C. § 352(o); See also CPG at 4. The FDA provides an electronic database of all registered manufacturers and of all drugs listed under section 510 on its website at https://www.accessdata.fda.gov/scripts/cder/drls/default.cfm and https://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/ucm191015. htm, respectively.

f) Because these products can be regulated as drugs and meet the statutory definitions of drugs, certain statutory and regulatory requirements apply to the manufacturing of the Prescription Pet Food at issue herein under Missouri state law, including, but not limited to, licensing and/or registration requirements, facility specifications and product processing requirements, record keeping requirements, and facility inspections. See, e.g., Mo. Rev. Stat. § 338.210 *et seq.*, 20 C.S.R. § 2220-5.020.[1] These requirements differ depending on whether or not the manufacturing occurs in the state or outside of the state, but in either situation, the manufacturer must be licensed or registered with the State of Missouri. Missouri also provides an electronic database of licensed and registered entities on its website at https://renew.pr.mo.gov/pharmacy-licensee-search.asp.

---

[1] These requirements are detailed and further explained by the Missouri Board of Pharmacy in the "Missouri Drug Distributor Compliance Guide" dated February 2012 and available on the Missouri Board of Pharmacy website at https://pr.mo.gov/pharmacists-drug-distributors.asp.

g)      According to the FDA website, neither Mars/Royal Canin nor Purina is registered
with the FDA as a manufacturer of animal drugs or has listed any drugs on the Electronic
Animal Drug Product Listing Directory in connection with any Prescription Pet Food.[2]

h)      According to the Missouri Board of Pharmacy website, neither Mars/Royal Canin
nor Purina has a current license or registration as a wholesale drug distributor with the
Board of Pharmacy.

i)      Based upon the foregoing, neither Mars/Royal Canin nor Purina has complied
with the relevant licensing or registration requirements of the Missouri statutes and
regulations or with the registration and listing requirements of the FD&C Act, and each is
therefore in violation of those statutes and regulations.

73.     The decision to continue their Prescription Pet Food combination and conspiracy
as they had been doing in violation of federal and state law was a decision made collectively by
Mars/Royal Canin, Purina, and their co-conspirators, in that such a decision was contrary to the
independent economic self-interest of each of them without agreement with the others, but
rational if made collectively to continue their successful combination. The conduct of
Mars/Royal Canin, Purina, and each other co-conspirator in violating the FD&C Act and various
federal and state deceptive trade practice and consumer protection laws all by itself exposed each
to multiple risks, including (1) potential solicitation of FDA enforcement action by a competitor
or consumer; (2) suit by another conspirator for deceptive marketing practices in violation of the
Lanham Act, 15 U.S.C. §-1125(a); (3) advertising to consumers exposing the sham selling of

---

[2] One listing does appear on the FDA's website for "Nestle Purina Petcare Company" with a Clinton, Iowa address
under the "Business Operations" listing of "Manufacture". This listing, however, does not appear to be in
connection with the Prescription Pet Food manufactured by Purina at issue in this case inasmuch as the only
corresponding drug listing on the Electronic Animal Drug Product Listing Directory is with regard to "Purina Pro
Plan Focus Hairball Remedy", which is not a Prescription Pet Food.

Prescription Pet Food and consequent loss of sales and consumer good will; and (4) suit by consumers on learning of the deception. Any of these risks could result in public exposure and the irrecoverable loss of consumer trust and goodwill, inasmuch as the deceptive use of the prescription requirement depended for its success on the unquestioning faith of vulnerable pet owners in the apparently disinterested advice and recommendations of their veterinarians. If, however, all conspirators, as the dominant sellers of Prescription Pet Food, agreed jointly to continue selling Prescription Pet Food as they had been, these risks would be substantially mitigated because of their combined resources and collective market power.

74.     Once the Draft CPG was issued, it is further implausible that Mars/Royal Canin, Purina, and Hill's would have each independently concluded that the Draft CPG suggested, recommended, or authorized the use of a prescription requirement in the marketing and sale of Prescription Pet Food, or that the Draft CPG suggested, recommended, or authorized their making disease claims on labeling or promotional materials provided to consumers, whether in print or on websites. It is further implausible that each would have independently decided to engage in a course of conduct in violation of the Draft CPG and the FD&C Act in exactly the same manner, as in fact occurred. That all three manufacturers decided to violate the Draft CPG and FD&C Act in the same way is explicable only as the result of a collective decision or agreement.

## V.     INJURY TO PLAINTIFFS

75.     Plaintiff Wullschleger began purchasing Royal Canin Veterinary Diet Hypoallergenic HP Adult dry Prescription Pet Food for her dog Clinton from PetSmart in approximately June, 2015, at the recommendation of a veterinarian at Banfield in her local PetSmart, and has continued to do so at the recommendations of other Banfield veterinarians at

the location. She was told then and has continued to be told by veterinarians at Banfield and sales people at PetSmart that she cannot buy this Prescription Pet Food product without a prescription and a completed MedCard from Banfield.

76.     When Plaintiff Wullschleger was told that she needed a prescription for the Royal Canin dog food she understood and believed that the Prescription Pet Food was intended to treat specific disease and health problems of her dog; that it contained medicine of some sort; that there had been some type of regulatory oversight in its manufacture; and that her purchasing the Prescription Pet Food was substantially similar to the purchase of prescription drugs from a pharmacy such as CVS. She also observed that the Prescription Pet Food was shelved in a section of the PetSmart store separate and distinct from the sections containing non-prescription pet food, and that signs in the Prescription Pet Food section advised that a prescription and MedCard from Banfield were required to purchase Prescription Pet Food.

77.     Royal Canin Veterinary Diet Hypoallergenic HP Adult dog food makes claims on its packaging including:

- Supports skin and digestive health in dogs with food sensitivity

- Helps maintain skin and coat health

- Supports the skin's natural barrier

- Helps maintain digestive health

- 100% Complete and Balanced Nutrition Canine Hydrolyzed Protein Adult HP is a highly palatable, highly digestible, complete and balanced hydrolyzed protein diet

- The diet is specifically formulated for use as short-term elimination feeding and as long-term nutrition for dogs with food sensitivities.

- Specific nutrient blend to help regulate intestinal transit and to help support the digestive flora

- Optimal amounts of B vitamins and amino acids help maintain the skin's natural barrier effect

- Long chain omega omega-3 fatty acids that promote a healthy skin and coat

- Hydrolyzed soy protein, composed of low molecular-weight peptides, is highly digestible and supports gastrointestinal and dermatological health

78.    Royal Canin also manufactures and markets non-prescription foods that make similar claims. By way of example, Royal Canin manufactures and markets non-prescription Royal Canin Maxi Sensitive Digestion dry dog food, which states on its packaging that it is for "Sensitive Digestion" and makes claims on its packaging including:

- "Helps support digestive health with high quality protein sources and maintain oligosaccharides. This formula helps promote a balanced intestinal flora and maintain stool quality."

- "This formula contains nutrients that help support healthy skin and coat."

- "L.I.P.: protein selected for its very high digestibility."

- "100% COMPLETE AND BALANCED NUTRITION MAXI SENSITIVE DIGESTION Size Health Nutrition is formulated to meet the nutritional levels established by the AAFCO (Association of American Feed Control Officials) Dog Food Nutrient Profiles for maintenance."

- "Helps support large breed dogs' healthy bones and joints"

79.    There are 42 total ingredients in Royal Canin Veterinary Diet HP dog food. Thirty-four of these ingredients are also in Royal Canin Maxi Sensitive Digestion dry dog food,

which has 51 total ingredients, for an overlap of more than 66 percent. The non-overlapping ingredients are not drugs and are not sufficient to justify one product being sold by prescription for a significantly higher price.

80. Despite these similarities, Royal Canin Veterinary Diet HP dog food currently sells for $3.83 per pound and Royal Canin Maxi Sensitive Digestion dry dog food for $1.92 per pound at PetSmart.

81. As a result of the false and fraudulent prescription requirement and the combination and conspiracy of Royal Canin, Purina, and their co-conspirators, Plaintiff Wullschleger paid more for Prescription Pet Food than she would have paid in the absence of the requirement, or would never have purchased Prescription Pet Food.

82. On the recommendation of her veterinarians, Plaintiff Brewer has purchased Purina Pro Plan Veterinary Diets UR St/Ox Urinary Formula Dry Prescription Pet Food for her cat Sassie from O'Fallon Veterinary Medical Center, Florissant Animal Hospital, and PetSmart beginning in 2009 and continuing through the present. She was told then and has continued to be told by veterinarians and sales people at PetSmart that she cannot buy this Prescription Pet Food without a prescription and a completed MedCard from Banfield. She was told that Purina Pro Plan Veterinary Diets UR St/Ox Urinary Formula Dry Prescription Pet Food was a specialized pet food that could only be purchased with a prescription.

83. When Plaintiff Brewer was told that she needed a prescription for the Purina cat food, she understood and believed that the Prescription Pet Food was intended to treat specific disease and health problems of her cat; that it contained medicine of some sort; that there had been some type of regulatory oversight in its manufacture; and that her purchasing the Prescription Pet Food was substantially similar to the purchase of prescription drugs from a

pharmacy such as CVS. She also observed that the Prescription Pet Food was shelved in a section of the PetSmart store separate and distinct from the sections containing non-prescription pet food, and that signs in the Prescription Pet Food section advised that a prescription and MedCard from Banfield were required to purchase Prescription Pet Food.

84. Purina Pro Plan Veterinary Diets UR St/Ox Urinary Formula Dry Prescription Pet Food makes claims on its packaging, including:

- Promotes increased urine flow to dilute the urine

- Helps dissolve struvite stones

- Helps reduce the risk of both struvite and calcium oxalate stone recurrence

- Promotes a urinary environment unfavorable to the development of struvite and calcium oxalate crystals

85. Purina also makes non-prescription Purina Pro Plan Focus Adult Urinary Tract Health Formula Dry Cat Food, which makes claims on its packaging, including:

- Helps maintain urinary tract health by reducing urinary pH and providing low    dietary magnesium

- Purina studies show: Diets that include acidifying ingredients promote a low urine pH while supporting cats' health

- pH Benefit: This formula effectively promotes a LOW URINE pH, which helps maintain a HEALTHY URINARY TRACT

86. There are 35 total ingredients in Purina Pro Plan Veterinary Diets UR St/Ox Urinary Formula Dry Cat Food. Twenty-eight of these ingredients are also in Purina Pro Plan Focus Adult Urinary Tract Health Formula Dry Cat Food, which has 38 total ingredients, for an

overlap of 74 percent. The non-overlapping ingredients are not drugs and are not sufficient to justify one product being sold by prescription for a significantly higher price.

87.     Despite these similarities, Purina Pro Plan Veterinary Diets UR St/Ox Urinary Formula Dry Cat Food currently sells for $4.03 per pound and Purina Pro Plan Focus Adult Urinary Tract Health Formula Dry Cat Food for $2.31 per pound at PetSmart.

88.     As a result of the false and fraudulent prescription requirement and the combination and conspiracy of Royal Canin, Purina, and their co-conspirators, Plaintiff Brewer paid more for Prescription Pet Food than she would have paid in the absence of the requirement, or would never have purchased Prescription Pet Food.

89.     Plaintiffs Wullschleger and Brewer, who are currently feeding their pets Prescription Pet Food, are reluctant to change their pets' diet abruptly and may again purchase Prescription Pet Food if their pets reacted well to it in the past, or if their veterinarians prescribe a new Prescription Pet Food. It is therefore essential to the fairness of the transaction not only for Plaintiffs, but for all Class Members, that Defendants' violations of law be enjoined. The veterinarians and store personnel with whom Plaintiffs and Class members interface with in purchasing Prescription Pet Food will generally not be in a position to confirm that the Prescription Pet Food at issue is not (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; or (e) a substance legally required to be sold by prescription. The Defendants themselves must therefore be enjoined to stop their violations at the source, before they filter down to the consumer level and vitiate the actual purchase transactions.

## VI.     CLASS ACTION ALLEGATIONS

90.    For purposes of their claims under the Missouri Antitrust Law, Mo. Rev. Stat. §§ 416.011 *et seq.*, Plaintiffs seek to represent a class consisting of and defined as all Missouri citizens who purchased Prescription Pet Food in Missouri for personal, family, or household purposes directly or indirectly from Royal Canin, Purina, or any of their co-conspirators during the five years next prior to the filing of this lawsuit ("the Missouri Antitrust Class").

91.    For purposes of her claims under the Missouri Merchandising Practices Act, Mo. Rev. Stat., §§ 407.010 *et seq.*, and Missouri law of unjust enrichment, Plaintiff Wullschleger seeks to represent a class consisting of and defined as all Missouri citizens who purchased in Missouri Royal Canin Prescription Pet Food for personal, family, or household purposes during the five years next prior to the filing of this lawsuit ("the Missouri Royal Canin Class").

92.    For purposes of her claims under the Missouri Merchandising Practices Act, Mo. Rev. Stat., §§ 407.010 *et seq.*, and Missouri law of unjust enrichment, Plaintiff Brewer seeks to represent a class consisting of and defined as all Missouri citizens who purchased in Missouri Purina Prescription Pet Food for personal, family, or household purposes during the five years next prior to the filing of this lawsuit ("the Missouri Purina Class").

93.    Plaintiffs' claims are typical of the respective classes they seek to represent in that all class members in each class are Missouri citizens who purchased Prescription Pet Food in Missouri from Defendants and their co-conspirators because it was prescribed for their pets by a veterinarian pursuant to the prescription requirement imposed by Defendants and their co-conspirators, and, as reasonable consumers, all class members utilized the prescription to purchase that pet food based upon the misrepresentations communicated by the prescription, as alleged hereinabove. Regardless of any differences in the products purchased, all class members purchased Prescription Pet Food in reliance on and because of the same combination and

conspiracy, misrepresentation, and unfair and deceptive practice imposed by Defendants and their co-conspirators—the false prescription requirement— and paid an unjustified price premium, in the absence of which they would not have purchased the Prescription Pet Food, or would have paid a lower price.

94. Members of each of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class Members for each Class is currently unknown, and can only be ascertained through appropriate discovery, the members of the Classes are likely to number at least in the thousands, and the disposition of the Class Members' claims in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in the possession, custody, or control of Defendants, retailers of Prescription Pet Food, veterinarians, and the Class Members.

95. Common questions of law and fact exist as to all members of the Classes, and predominate over any questions solely affecting individual members of each Class. Questions of law and fact common to the Classes include, but are not limited to, the following:

a. Whether Defendants and their co-conspirators have imposed a "prescription" requirement on Prescription Pet Food they manufacture, market, and sell, notwithstanding that Prescription Pet Food is not a drug and has not been subjected to FDA review or clearance as a drug;

b. Whether the prescription requirement and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food contains some substance medically necessary to health;

c. Whether the prescription requirement and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food contains some sort of drug, medicine, or other controlled ingredient;

d. Whether the prescription requirement and Defendants' related representations and omissions materially misrepresent that the statements regarding the intended uses and effects of Prescription Pet Food have been evaluated by the FDA;

e. Whether the prescription requirement and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food requires a prescription under federal or state law;

f. Whether the prescription requirement and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food is so materially different from non-prescription pet food that paying a price premium is warranted;

g. Whether Prescription Pet Food is misbranded;

h. Whether Plaintiffs and Class Members are entitled to a declaratory judgment;

i. Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary or permanent injunction;

j. Whether Plaintiffs and Class Members are entitled to restitution or disgorgement and the amount;

k. Whether Plaintiffs and Class Members are entitled to punitive or exemplary damages and the amount;

l. Whether Defendants should be required to make restitution, disgorge profits, reimburse losses, pay damages, or pay treble damages as a result of the above-described practices;

m. Whether Defendants and their co-conspirators have combined and conspired to misrepresent Prescription Pet Food as part and in furtherance of a combination and conspiracy to fix, raise, stabilize, or peg prices of Prescription Pet Food;

n. Whether Defendants and their co-conspirators have conspired to monopolize the market for Prescription Pet Food in the United States and/or the State of Missouri;

o. Whether the combination and conspiracy of Defendants and their co-conspirators to fix, raise, stabilize, or peg the prices of Prescription Pet Food has caused injury to the business or property of Plaintiffs and the Class Members;

p. The amount of the overcharge and damage paid as a result of the combination and conspiracy to fix, raise, stabilize, or peg the prices of Prescription Pet Food, or the Defendants' deceptive trade practices;

q. Whether Defendants' actions as described above violate the Missouri Antitrust Law, Mo. Rev. Stat., §§ 416.011 *et seq.*; and

r. Whether Defendants' actions as described above violate the Missouri Merchandising Practices Act, Mo. Rev. Stat., §§ 407.010 *et seq.*

96. The claims of Plaintiffs are typical of the claims of Class members because Plaintiffs and each member of the Classes purchased Prescription Pet Food, and suffered a monetary loss as a result of that purchase. Further, the factual bases of Defendants' conduct are common to Plaintiffs and the members of each Class and represent a common thread of misconduct resulting in an injury common to all Class members.

97. Plaintiffs are adequate representatives of the respective Classes because their interests do not conflict with the interests of the Class Members Plaintiffs seek to represent, Plaintiffs have retained competent counsel experienced in prosecuting class actions, and

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

Plaintiffs intend to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

98.     Class certification and class-wide litigation and relief are appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Liability, injury, and damages can be proved on a class-wide basis. Joinder of all members is impracticable. Furthermore, the damages suffered by the individual members of the Classes may be so small that the expense and burden of individual litigation make it impossible for most members of the Classes individually to redress the wrongs done to them. Absent a class action, Class Members' damages will go uncompensated, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact will also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

99.     Defendants have acted in a uniform manner with respect to the Plaintiffs and Class Members of each Class. Class-wide declaratory, equitable, and injunctive relief is appropriate because Defendants have acted on grounds that apply generally to the Classes, and inconsistent adjudications with respect to Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Class-wide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding Prescription Pet Food.

## VII.   JURISDICTION

100.   This Court has jurisdiction of this action pursuant to the Missouri Antitrust Law, Mo. Rev. Stat., § 416.121, and the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.025.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF MISSOURI ANTITRUST LAW § 416.031.1

### (Royal Canin, Purina)

101.   Plaintiffs, on behalf of themselves and the Missouri Antitrust Class, hereby re-allege and incorporate by reference the allegations in the preceding paragraphs as if set forth in full herein.

102.   Continuously during the five years next prior to the filing of this Petition, Defendants and their co-conspirators have entered into a contract, combination, or conspiracy in restraint of trade or commerce in Missouri to fix, raise, stabilize, and peg prices for Prescription Pet Food by agreeing, combining, and conspiring to misrepresent and market and sell Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate.

103.   Defendants' combination and conspiracy is per se unlawful under the Missouri Antitrust Law, Mo. Rev. Stat., § 416.031.1. Alternatively, Defendants' combination and conspiracy has unreasonably restrained trade and commerce in the market for Prescription Pet Food in the state of Missouri in violation of the Missouri Antitrust Law, Mo. Rev. Stat., § 416.031.1.

104.    Defendants' combination and conspiracy has led to anticompetitive effects, including unjustifiably increased prices for Prescription Pet Food, and otherwise caused injury to consumers and competition in the market for Prescription Pet Food in the state of Missouri, in that Plaintiffs and the Missouri Antitrust Class have paid more for Prescription Pet Food than they would have otherwise paid in the absence of Defendants' violation, and have thereby been injured in their business and property.

105.    Plaintiffs and the Missouri Antitrust Class will continue to suffer injury and other damage unless Defendants are enjoined from continuing to engage in their combination and conspiracy, and are thereby entitled to injunctive relief pursuant to the Missouri Antitrust Law, Mo. Rev. Stat., § 416.071.

106.    Plaintiffs and the Missouri Antitrust Class are entitled to all damages proximately caused by Defendants' violation of the Missouri Antitrust Law, including the unjustified price premium paid by them for Prescription Pet Food, and are entitled to three-fold such damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including a reasonable attorney's fee, pursuant to the Missouri Antitrust Law, Mo. Rev. Stat., § 416.121.

## COUNT II

## VIOLATION OF MISSOURI ANTITRUST LAW § 416.031.2

### (Royal Canin, Purina)

107.    Plaintiffs, on behalf of themselves and the Missouri Antitrust Class, hereby re-allege and incorporate by reference the allegations in the preceding paragraphs as if set forth in full herein.

108. Continuously during the five years next prior to the filing of this Petition, Defendants and their co-conspirators, with the specific intent to obtain a monopoly, have entered into a conspiracy to monopolize the market for Prescription Pet Food in the State of Missouri, and have committed overt acts in furtherance thereof, including agreeing, combining, and conspiring to misrepresent and market and sell Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate, and by agreeing, combining, and conspiring to limit and preclude non-conspiring competing manufacturers of Prescription Pet Food from access to major channels of distribution, including their co-conspirator retailers and veterinary clinics.

109. Defendants' conspiracy to monopolize the market for Prescription Pet Food in the State of Missouri is unlawful under the Missouri Antitrust Law, Mo. Rev. Stat., § 416.031.2.

110. Defendants' conspiracy to monopolize the Prescription Pet Food market in the State of Missouri has led to anticompetitive effects, including unjustifiably increased prices for Prescription Pet Food, and otherwise caused injury to consumers and competition in the market for Prescription Pet Food in the State of Missouri, in that Plaintiffs and the Missouri Antitrust Class have paid more for Prescription Pet Food than they would have otherwise paid in the absence of Defendants' violation, and have thereby been injured in their business and property.

111. Plaintiffs and the Missouri Antitrust Class will continue to suffer injury and other damage unless Defendants are enjoined from continuing to engage in their conspiracy to monopolize, and are thereby entitled to injunctive relief pursuant to the Missouri Antitrust Law, Mo. Rev. Stat., § 416.071.

112. Plaintiffs and the Missouri Antitrust Class are entitled to all damages proximately caused by Defendants' violation of the Missouri Antitrust Law, including the unjustified price

premium paid by them for Prescription Pet Food, and are entitled to three-fold such damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including a reasonable attorney's fee, pursuant to the Missouri Antitrust Law, Mo. Rev. Stat., § 416.121.

## COUNT III

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT § 407.020, *et seq.*
## (Royal Canin)

113.    Plaintiff Wullschleger, on behalf of herself and the Missouri Royal Canin Class, hereby re-alleges and incorporates by reference the allegations in the preceding paragraphs as if set forth in full herein.

114.    Continuously during the five years next prior to the filing of this Petition, Royal Canin has engaged in the act, use, and employment of deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the concealment, suppression, or omission of any material fact in connection with the sale and advertisement of Royal Canin Prescription Pet Food in trade or commerce in the state of Missouri by misrepresenting and marketing and selling Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate.

115.    The conduct of Royal Canin in the act, use, and employment of deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the concealment, suppression, or omission of any material fact in connection with the sale and advertisement of Prescription Pet Food in trade or commerce in the state of Missouri is unlawful under the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020 *et seq.*

116.     The violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat., §

407.020, by Royal Canin has caused Plaintiff Wullschleger and the Missouri Royal Canin Class

to suffer an ascertainable loss of money or property, real or personal, as a result of the use or

employment by Royal Canin of a method, act, or practice declared unlawful by section 407.020,

in that Plaintiff Wullschleger and the Missouri Royal Canin Class have paid more for

Prescription Pet Food than they would have otherwise paid in the absence of Defendant's

violation, and have thereby been injured in their persons and property.

117.     Plaintiff Wullschleger and the Missouri Royal Canin Class will continue to suffer

injury and other damage unless Defendant Royal Canin is enjoined from continuing to engage in

violations of Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020, and are thereby

entitled to injunctive relief pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat.,

§ 407.025.

118.     Plaintiff Wullschleger and the Missouri Royal Canin/Purina Class are entitled to

all actual damages proximately caused by said Defendant's violation of the Missouri

Merchandising Practices Act, Mo. Rev. Stat., § 407.020, including the unjustified price premium

paid by them for Prescription Pet Food, and are entitled to punitive damages, together with

injunctive relief, and attorney's fees, pursuant to the Missouri Merchandising Practices Act, Mo.

Rev. Stat., § 407.025.

**COUNT IV**

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT § 407.020, *et seq.***

**(Purina)**

Electronically Filed - Jackson - Kansas City - February 08, 2019 - 03:54 PM

119.     Plaintiff Brewer, on behalf of herself and the Missouri Purina Class, hereby re-alleges and incorporates by reference the allegations in the preceding paragraphs as if set forth in full herein.

120.     Continuously during the five years next prior to the filing of this Petition, Purina has engaged in the act, use, and employment of deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the concealment, suppression, or omission of any material fact in connection with the sale and advertisement of Prescription Pet Food in trade or commerce in the state of Missouri by misrepresenting and marketing and selling Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate.

121.     The conduct of Purina in the act, use, and employment of deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the concealment, suppression, or omission of any material fact in connection with the sale and advertisement of Prescription Pet Food in trade or commerce in the state of Missouri is unlawful under the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020 *et seq.*

122.     The violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020 by Purina has caused Plaintiff Brewer and the Missouri Purina Class to suffer an ascertainable loss of money or property, real or personal, as a result of the use or employment by Purina of a method, act, or practice declared unlawful by section 407.020, in that Plaintiff Brewer and the Missouri Purina Class have paid more for Prescription Pet Food than they would have otherwise paid in the absence of Purina's violation, and have thereby been injured in their persons and property.

123.    Plaintiff Brewer and the Missouri Purina Class will continue to suffer injury and other damage unless Purina is enjoined from continuing to engage in violations of Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020, and are thereby entitled to injunctive relief pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.025.

124.    Plaintiff Brewer and the Missouri Purina Class are entitled to all actual damages proximately caused by Purina's violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.020, including the unjustified price premium paid by them for Prescription Pet Food, and are entitled to punitive damages, together with injunctive relief, and attorney's fees, pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.025.

## COUNT V

## UNJUST ENRICHMENT

### (Royal Canin)

125.    Plaintiff Wullschleger, on behalf of herself and the Missouri Royal Canin Class, hereby re-alleges and incorporates by reference the allegations in the preceding paragraphs as if set forth in full herein.

126.    Continuously during the five years next prior to the filing of this Petition, Royal Canin has been unjustly enriched in violation of the common law of the state of Missouri by misrepresenting and marketing and selling Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate, pursuant to which Royal Canin induced Plaintiff Wullschleger and the Missouri Royal Canin Class to confer a benefit on Royal Canin by paying an unwarranted price premium for Prescription Pet Food. Royal Canin was aware of and willfully induced Plaintiff Wullschleger

and the Missouri Royal Canin to confer such benefit, which Royal Canin has inequitably kept for itself.

127.    The violation of the Missouri common law of unjust enrichment by Royal Canin has caused Plaintiff Wullschleger and the Missouri Royal Canin Class to suffer an ascertainable loss of money or property, real or personal, as a result of the use the false and fraudulent prescription requirement by Royal Canin, in that Plaintiff Wullschleger and the Missouri Royal Canin Class have paid more for Prescription Pet Food than they would have otherwise paid in the absence of said Defendant's violation, and have thereby been injured in their persons and property.

128.    Plaintiff Wullschleger and the Missouri Royal Canin Class will continue to suffer injury and other damage unless Royal Canin is enjoined from continuing to engage in violations of Missouri common law of unjust enrichment, and are thereby entitled to injunctive relief.

129.    Plaintiff Wullschleger and the Missouri Royal Canin Class are entitled to all actual damages proximately caused by Royal Canin's violation of Missouri common law of unjust enrichment, including disgorgement and restitution of the price premium they have paid for Prescription Pet Food, together with their costs and such other relief as may be appropriate.

## COUNT VI

## UNJUST ENRICHMENT

### (Purina)

130.    Plaintiff Brewer, on behalf of herself and the Missouri Purina Class, hereby re-alleges and incorporates by reference the allegations in the preceding paragraphs as if set forth in full herein.

131. Continuously during the five years next prior to the filing of this Petition, Purina has been unjustly enriched in violation of the common law of the state of Missouri by misrepresenting and marketing and selling Prescription Pet Food through a knowingly deceptive, misleading, and self-imposed prescription requirement having no legal basis or mandate, pursuant to which it induced Plaintiff Brewer and the Missouri Purina Class to confer a benefit on it by paying an unwarranted price premium for Prescription Pet Food. Purina was aware of and willfully induced Plaintiff Brewer and the Missouri Purina Class to confer such benefit, which Purina has inequitably kept for itself.

132. The violation of the Missouri common law of unjust enrichment by Purina has caused Plaintiff Brewer and the Missouri Purina Class to suffer an ascertainable loss of money or property, real or personal, as a result of the use the false and fraudulent prescription requirement by Purina, in that Plaintiff Brewer and the Missouri Purina Class have paid more for Prescription Pet Food than they would have otherwise paid in the absence of Purina's violation, and have thereby been injured in their persons and property.

133. Plaintiff Brewer and the Missouri Purina Class will continue to suffer injury and other damage unless Purina is enjoined from continuing to engage in violations of Missouri common law of unjust enrichment, and are thereby entitled to injunctive relief.

134. Plaintiff Brewer and the Missouri Purina Class are entitled to all actual damages proximately caused by Purina's violation of Missouri common law of unjust enrichment, including disgorgement and restitution of the price premium they have paid for Prescription Pet Food, together with their costs and such other relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter Orders and Judgment against Defendants as follows:

135.     Certifying the Missouri Antitrust Class, the Missouri Royal Canin, and the Missouri Purina Class, or such other alternative classes as the Court shall determine, under Missouri Rule of Civil Procedure 52.08 and Missouri Statutes § 407.025.3, and naming the Plaintiffs as representatives of the respective Classes, and Plaintiffs' attorneys as Class Counsel to represent the Class Members;

136.     Finding, adjudging, and decreeing that Defendants have engaged in the violations of law alleged in this Petition;

137.     Enjoining Defendants from engaging in further such violations of law as the jury shall find and the Court shall adjudge and decree;

138.     Estopping Defendants from denying Prescription Pet Food is a "drug" and enjoining Defendants to comply with all federal and Missouri provisions applicable to the manufacture of such drugs, or alternatively, enjoining Defendants from making the disease treatment claims on the packaging of Prescription Pet Food;

139.     Declaring that Defendants are financially responsible for notifying all Class Members about the true nature of Prescription Pet Food;

140.     Awarding to Plaintiffs and the Classes such damages as the jury shall find for the violations alleged;

141.     Awarding to Plaintiffs and the Missouri Antitrust Class three-fold such damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including a reasonable attorney's fee, pursuant to the Missouri Antitrust Law § 416.121;

142. Awarding to Plaintiff Wullschleger and the Missouri Royal Canin Class, and to Plaintiff Brewer and the Missouri Purina Class, punitive damages, together with injunctive relief, and attorney's fees, pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat., § 407.025.1;

143. Finding, declaring, and decreeing that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits received from the sale of Prescription Pet Food in violation of Missouri common law of unjust enrichment;

144. Awarding prejudgment interest on all amounts recovered; and

145. Awarding all such other and further relief to which Plaintiff and the Classes are entitled.

## JURY TRIAL DEMAND

146. Plaintiffs demand a trial by jury on all issues so triable.


Respectfully submitted,

**BARTIMUS FRICKLETON ROBERTSON RADER, P.C.**

BY:   */s/ James P. Frickleton*
   **JAMES P. FRICKLETON**   **MO #31178**
   **ANNE M. TARVIN**     **MO #65405**
   **11150 OVERBROOK ROAD, SUITE 200**
   **LEAWOOD, KS 66211-2298**
   **(913) 266-2300/ (913) 266-2366 FAX**
   **kellyf@bflawfirm.com**
   **jimf@bflawfirm.com**
   **krobertson@bflawfirm.com**
   **mmarvel@bflawfirm.com**

   **Michael L. McGlamry**
   **GA State Bar #492515**
   **Pro Hac Vice pending**
   **Wade H. Tomlinson**
   **GA State Bar #714605**
   **Pro Hac Vice pending**

POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph:  404-523-7706
Fx:  404-524-1648
efile@pmkm.com

Edward J. Coyne, III     NC State Bar #33877
Pro Hac Vice pending
WARD AND SMITH, P.A.
127 Racine Drive
Wilmington, NC  28403
Ph:  910-794-4800
Fx:  910-794-4877
ejcoyne@wardandsmith.com

Michael A. Kelly        CA State Bar #71460
Pro Hac Vice pending
Matthew D. Davis
CA State Bar #141986
Pro Hac Vice pending
WALKUP, MELODIA,
KELLY & SCHOENBERGER
650 California Street, 26th Floor
San Francisco, CA  94108
Ph:  415-981-7210
Fx:  415-391-6965
mkelly@walkuplawoffice.com
mdavis@walkuplawoffice.com

Daniel R. Shulman       MN State Bar 00651
Pro Hac Vice pending
Julia Dayton Klein       MN State Bar 19181
Pro Hac Vice pending
GRAY, PLANT, MOOTY, MOOTY
& BENNETT, P.A.
80 South 8th Street, Suite 500
Minneapolis, MN  55402
Ph:  612-632-3335
Fx:  612-632-4335
daniel.shulman@gpmlaw.com
julia.klein@gpmlaw.com


**ATTORNEYS FOR PLAINTIFFS**